**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**



FILED
RICHARD W. NAGEL
CLERK OF COURT

2023 MAR 21 PM 12: 43

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

|  |  |  |
|---|---|---|
| TRACIE M. HUNTER<br>PO Box 32325<br>Cincinnati, OH 45232,<br>        **PLAINTIFF** | : <br> : <br> : <br> : <br> : | **Case**<br><br>**2:23 CV1025**<br><br>**JUDGE** |
| v. | : <br> : | |
| Richard Dove, individually, and in his<br>official capacity as Director for the Ohio Board<br>of Professional Conduct of the State of Ohio | : <br> : <br> : <br> : | **VERIFIED COMPLAINT FOR**<br>**DECLARATORY AND**<br>**INJUNCTIVE RELIEF, COSTS,**<br>**DAMAGES AND ATTORNEY'S** |
| **SERVE:**<br>**Richard Dove**<br>**Ohio Office of Disciplinary Counsel,**<br>**65 South Street, 5th Floor**<br>**Columbus, Ohio 43315-3431** | : <br> : <br> : <br> : <br> : <br> : <br> : | **FEES FOR CONSTITUTIONAL**<br>**VIOLATIONS**<br><br>JUDGE MORRISON<br><br>MAGISTRATE JUDGE DEAVERS |
| and | : <br> : | |
| Joseph Caliguiri, individually, and in his<br>official capacity a Disciplinary Counsel for the<br>Supreme Court of the State of Ohio, | : <br> : <br> : <br> : <br> : | |
| **SERVE:**<br>**Joseph Caligiuri, Disciplinary Counsel,**<br>**Ohio Office of Disciplinary Counsel,**<br>**65 E. State St. Ste. 1510**<br>**Columbus, OH. 43215** | : <br> : <br> : <br> : <br> : <br> : | |
|         **DEFENDANTS** | : | |

## I.  JURISDICTION AND VENUE

1.  Jurisdiction over Plaintiff's civil rights claims and causes of action is conferred on

this Court by 42 U.S.C. §1983; 28 U.S.C. §§1331, 1343; 12 USC 3416, the United

States Constitution, the Ohio Constitution (Article I, §§1, 16), (Article IV, §§ 4, 6,) and other applicable law.

2.    Venue in this District and Division is conferred by 28 U.S.C. §§ 1391, 1367 and other applicable law because the deprivations of Plaintiff's constitutional and civil rights occurred in this District, and current and future deprivations of her rights are threatened, still occurring and are likely to continue to occur in the future within this District.

3.    The actions that are set forth within this complaint occurred within Franklin County, Ohio. Therefore, venue with this court is proper pursuant to S.D. Ohio Local Rule 82.1.

## 1. PARTIES

4.    Plaintiff Tracie Hunter has at all times relevant to this action been a resident and citizen of the State of Ohio and Hamilton County. She was admitted to the practice of law in the State of Ohio in 1993 and elected as judge to the Hamilton County Juvenile Court in 2010. She was not sworn in until May 2012; eighteen months after the official start of her judicial term, because the: Ohio Supreme Court (OSC), under former Chief Justice Maureen O'Connor; Ohio Republican Party; former Ohio Secretary of State Jon Husted, Hamilton County Republican Party; and former Hamilton County Prosecutor Joseph T. Deters collectively intervened to keep Hunter from assuming office as the duly elected Judge of the Hamilton County Juvenile Court.[12]

---

[1] *State ex Rel. Painter v. Brunner*, 127 Ohio St. 3d 463, 2010 Ohio 6461, 940 N.E.2d 978 (Ohio 2010)

5.      Defendant Joseph Caligiuri, at all times relevant to this action was the
Disciplinary Counsel for the Ohio Supreme Court. He is a citizen of the State of
Ohio and licensed to practice law in the State of Ohio. Defendant is a person
under 42 U.S.C. §1983 and at all times relevant to this case acted under color of
law. He is sued individually and in his official capacity.

6.      Defendant Richard Allen Dove, at all times relevant to this action was the
Director of the Ohio Board of Professional Conduct for the Ohio Supreme Court.
He is a citizen of the State of Ohio and licensed to practice law in the State of
Ohio. Defendant is a person under 42 U.S.C. § 1983 and at all times relevant to
this case acted under color of law. He is sued individually and in his official
capacity.

### INTRODUCTION

7.      This is an action involving the deprivation of Plaintiff's Fourteenth Amendment
rights to Due Process and Equal Protection of the Law by the Defendants named
herein. This action seeks injunctive and declaratory relief under 42 U.S.C. §1983,
compensatory and punitive damages and costs and attorney's fees under 42
U.S.C. 1988, if applicable. Defendants have unlawfully engaged in the selective
and vindictive prosecution of Plaintiff, retaliated against Plaintiff for exercising
her First Amendment right to petition the Government for a redress of her
grievances; and colluded with others under their jurisdiction to obstruct
Plaintiff's Constitutional rights to obtain relief by covering up the unlawful and
unethical acts committed by those persons to falsely charge Hunter with crimes.

---

[2] *Hunter v. Hamilton Cnty. Bd. of Elections*, 850 F. Supp. 2d 795 (S.D. Ohio 2012)

8.  Defendants have unlawfully engaged in an ongoing pattern of conduct resulting in racial discrimination and a violation of equal protection under the law whereby Plaintiff Hunter has been treated differently than other similarly situated white judges and lawyers and falsely charged with crimes that were committed by white lawyers that desired to remove Hunter. When Defendants became aware that those lawyers tampered with evidence and withheld exculpatory evidence to cover up the criminal acts committed against Hunter by those individuals, that was discovered by a forensic specialist and other records two years after Hunter's trial, Defendants dismissed Hunter's complaints to keep their acts hidden and colluded with those lawyers in violation of Hunter's rights.

9.  Defendants operate an arbitrary, clandestine disciplinary process that enables them to cover up misconduct of white judges and lawyers, even when evidence is overwhelming. By engaging the disciplinary process in a shroud of secrecy and preventing complainants, but not the accused, from making complaints public, Defendants have controlled and manipulated the disciplinary process by selectively dismissing complaints against white lawyers and judges. *Ex. A*

10. Defendants have engaged in an extensive pattern of abuse of power, conspiracy and cover up of unlawful and unethical conduct by lawyers and judges under their governmental authority. Defendants' conduct has created a clear pattern of racial discrimination and violated Plaintiff's right to equal protection and due process when they failed to prosecute white judges and lawyers for conduct that Defendants knew or should have known was unlawful.

11. Defendants failed to prosecute Ohio Supreme Court Justices Patrick DeWine and
former Hamilton County Prosecutor, now Supreme Court Justice, Joseph T.
Deters, both white, when DeWine requested Deters hire his son in the
Prosecutor's Office in an email and secured a public contract for a family
member when Deters instructed his staff to hire DeWine's son stating "another –
for sure" and they immediately hired him, in violation of ORC 2921.42.[3] *Ex. B.*
Defendants also failed to prosecute Deters when he secured a public contract for
a business associate, his personal criminal lawyer and lawyer's son, in violation
of the same statute. Defendants dismissed complaints against DeWine and
Deters to prevent them from facing discipline, while they continued to
selectively suspend and prosecute Judge Hunter in violation of the law. *Ex. C*

12. Defendants were aware when they strategically dismissed every grievance filed
against Deters and DeWine that both were directly involved in the prosecution
and subsequently denied appeals of suspended Judge Hunter, pursuant to the
statute they openly violated without recourse. ORC 2921.42.[4]

13. Defendants violated Judge Hunter's rights to be treated equally under the law
when they treated her differently than DeWine and Deters; and also knew that
DeWine and Deters involvement in Judge Hunter's case was a clear conflict of

---

[3] A) No public official shall knowingly do any of the following:
(1) Authorize, or employ the authority or influence of the public official's office to secure authorization of any
public contract in which the public official, a member of the public official's family, or any of the public
official's business associates has an interest;

[4] A) No public official shall knowingly do any of the following:
(1) Authorize, or employ the authority or influence of the public official's office to secure authorization of any
public contract in which the public official, a member of the public official's family, or any of the public
official's business associates has an interest;

interest, given their well-publicized violation of ORC 2921.42. Deters initiated

Hunter's prosecution. DeWine upheld the conviction on appeal.

14.     Defendants violated Judge Hunter's right to be treated fairly under the law when

they knew that Deters initiated criminal allegations against her to retaliate after

she filed ethics complaints against him and three assistant prosecutors for their

misconduct on Juvenile Court cases in her courtroom and for mishandling civil

lawsuits filed against her as judge. Defendants also knew it was unlawful for

prosecutors to retaliate against a sitting judge by falsely accusing her of crimes

that they, the responsible court employees and the State's expert witness

testified they knew she did not commit before charging her. *Ex. D*

15.     Defendants violated Judge Hunter's Constitutional rights to equal protection

when they denied her the same effective assistance of counsel they provided

similarly situated white judges when sued in their judicial capacities. Defendants

further violated Hunter's rights to equal protection when they failed to discipline

Deters and four lawyers, working for Deters, that wantonly failed to answer or

defend 12 frivolous lawsuits filed against her. Defendants then allowed Deters to

retain his private divorce law firm, Croswell & Adams, and his private criminal

attorney Scott Croswell to violate Judge Hunter's Fourth Amendment rights and

charge her with felonies that included theft and misuse of a credit card when she

was forced to defend the 12 lawsuits that Deters, and the four lawyers he picked

to represent her, failed to defend or answer. *Ex. E, F, G, H, I*

16.     Defendants violated Judge Hunter's Fourth Amendment rights when they knew

Deters and his lawyer Croswell conspired to charge Judge Hunter with felony

6

crimes of tampering with evidence and forgery after they knew that court staff, including Attorney Connie Murdock, unlawfully changed Judge Hunter's judicial entries, then destroyed computers at Juvenile Court containing evidence favorable to Hunter before they indicted her. Croswell then withheld exculpatory evidence that Hunter was entitled to receive to cover up that he knew she was innocent of those charges, but charged her in violation of the law. Croswell dismissed nine felony charges against Hunter after a forensic computer expert discovered and exposed that the State destroyed exculpatory computer evidence; but Defendants, aware of their unlawful acts, failed to discipline those lawyers. *Ex. J*

17.     Defendants violated Judge Hunter's Fourteenth Amendment right to equal protection under the law when they selectively prosecuted her after Deters falsely accused her of backdating documents to prevent his appeals. Albeit untrue, it was a question of law that should have been decided by an appellate court, not a criminal court with intent to remove a black judge. Public Defender Margie Slagle testified that prosecutors appealed all of their cases from Judge Hunter's courtroom with no problem because time did not begin to run on appeals until journal entries were time-stamped by the clerk's office and parties served, which Judge Hunter clearly knew and Deters should have known. *Ex. K*

18.     Defendants violated Judge Hunter's Fourteenth and Fourth Amendment rights when they trained her during two new judge's orientations that focused on employment law to investigate all incidents she could be sued and held legally liable as the statutory employer of the Juvenile Court; then allowed Deters and

7

Croswell to indict her for carrying out the duties and responsibilities as court employer in the manner she was trained by the Ohio Supreme Court. *Ex. L.*

19. Although Plaintiff Hunter filed grievances, as directed by the Ohio Supreme Court's disciplinary process and provided indisputable evidence that white lawyers and judges committed the alleged acts and fabricated allegations that led to her being falsely accused of crimes and prosecuted by the same individuals that aggressively sought to prevent her election, Defendants dismissed the grievances to cover up their actions to prevent the truth from being exposed. In each instance, Defendants responded they had a conflict of interest; selectively failed to investigate the grievance; refused to disclose the nature of the conflict upon request; and selectively dismissed valid complaints in violation of the United States and Ohio Constitutions, Ohio Rules of Professional Conduct and Ohio Judicial Code of Conduct, which caused Plaintiff undue harm and effectively denied her equal protection and due process under the law. *Ex. M*

20. On March 7, 2023, The Cincinnati Enquirer published other well-known conduct by Deters and DeWine that amounted to violations of law and ethics; but Defendants selectively failed to prosecute, suspend, or bar them from the practice of law in the same manner that they selectively prosecuted, suspended and barred Hunter as a judge and from practicing law. *Ex. N*

21. On March 9, 2023, The Cleveland Plain Dealer published an editorial further exposing conduct of Deters and DeWine that amounted to violations of law and ethics; but Defendants selectively failed to prosecute, suspend, or bar them from

the practice of law, as they selectively prosecuted, suspended and barred Hunter as a judge and from practicing law. *Ex. O*

## STATEMENT OF CASE

22. Over 120,000 citizens elected Hunter Judge of the Hamilton County Juvenile Court in 2010, but the Hamilton County Board of Elections unconstitutionally discarded thousands of votes in majority African-American precincts to prevent her election.[5]

23. The Ohio Supreme Court (OSC), led by retired Justice O'Connor, attempted to circumvent this Court's ruling and prevent Plaintiff Hunter's election as judge by rescinding orders of then Ohio Secretary of State Jennifer Brunner to count votes in Hunter's election.[6]

24. Plaintiff Hunter was unconstitutionally deprived of her elected office until May 2012 after she prevailed in a lawsuit in this Court to compel unlawfully denied votes to be counted. Prosecutor Deters and chief trial counsel James Harper represented the Hamilton County Board of Elections against Plaintiff.

25. After Plaintiff was sworn in as the first African-American and first Democratic Judge in the history of the Hamilton County Juvenile Court, abuse by Prosecutor Deters, lawyers and others under Defendant's control, continued after the election lawsuit and escalated to threats, lawsuits and daily harassment. Plaintiff was eventually compelled to file ethics complaints against Deters and three assistant prosecutors for misconduct on cases in her courtroom, including

---

[5] *Hunter v. Hamilton Cnty. Bd. of Elections*, 850 F. Supp. 2d 795 (S.D. Ohio 2012)
[6] *State ex Rel. Painter v. Brunner*, 128 Ohio St. 3d 17, 2011 Ohio 35 (Ohio 2011)

refusing her direct orders to turn over discovery to defendants, failing to appoint independent legal counsel to represent her, despite clear conflicts of interest, and failure to answer 12 lawsuits or provide her effective assistance of counsel after they insisted on being her attorneys. Those complaints were dismissed when Hunter was suddenly charged with felonies and suspended. *Ex. E, F, G, H, I*

26.     Following Hunter's complaints, Defendants allowed Deters to retaliate and accuse Hunter of crimes. Defendants knew that the proper protocol was to file an ethics complaint with the Ohio Supreme Court, if they suspected a judge of any misconduct. But Defendants allowed Deters to violate the rules governing judges and treat Judge Hunter differently than other judges, like Justice DeWine, that was brought up on ethical charges, not criminal charges, when he in fact secured a job for his son in the Prosecutor's Office, in violation of the law. *Ex. P*

27.     Defendants knew Deters had a conflict of interest, due to his open, unbridled hostility toward Judge Hunter that the news reported regularly; but allowed Deters to handpick his private lawyers that represented him in criminal and divorce proceedings to indict and prosecute Judge Hunter, rather than follow established protocol and appoint independent special prosecutors available for free with the State of Ohio. Defendants were also aware that Judge Beth Meyer, presiding judge of the Common Pleas Court, responsible for appointing special prosecutors, stipulated that Deters selected Croswell and Merlyn Shiverdecker and she did not vet them. Defendants knew that Croswell and Shiverdecker had never served as special prosecutors on any case until they were handpicked by

Deters and paid nearly one million dollars to selectively prosecute Hunter, in violation of the Fifth and Fourteenth Amendments. *Ex. Q*

28.    Defendants suspended Plaintiff Hunter as a judge from the Hamilton County Juvenile Court on January 10, 2014, without due process, in violation of Article 1V §17[7] of the Ohio Constitution and appointed Deters' former mother-in-law and First District Court of Appeals Judge Sylvia Hendon to preside over Hunter's cases through the remainder of Hunter's term to circumvent the Constitution. Defendants were aware that Deters' family members, Hendon and brother Dennis, and his close friends DeWine, Dinkelacker and First District Court of Appeals Judge Pat Fischer, now Ohio Justice Fischer, whose daughter Kathleen Caroline Fischer was employed by Deters as an assistant prosecutor and daily prosecuted cases in Judge Hunter's courtroom, should not have presided over Hunter's cases, trial or appeals, due to their clear conflicts of interest. Dennis Deters, after being appointed to the Hamilton County Board of Commissioners by Gov. Mike DeWine, voted at his brother Joe's request, to approve $500,000 more dollars for Croswell to continue prosecuting Judge Hunter, as they accused her of nepotism. Defendants colluded to enable this double standard. *Ex. Q*

29.    Defendants colluded with Deters, Croswell and others to fabricate criminal charges against Hunter for crimes that they knew she had not committed, then failed to prosecute those individuals when evidence surfaced that proved they

---

[7] Judges may be removed from office, by concurrent resolution of both houses of the general assembly, if two-thirds of the members, elected to each house, concur therein; but, no such removal shall be made, except upon complaint, the substance of which shall be entered on the journal, nor, until the party charged shall have had notice thereof, and an opportunity to be heard.

knew Judge Hunter was innocent when charged in violation of the fourth, fifth, sixth, eighth and fourteenth Amendments. Lisa Miller told Croswell that Judge Hunter did not backdate documents, yet he knowingly charged Hunter. *Ex. R*

30. In violation of her right to equal protection, Plaintiff has remained suspended as a judge and lawyer, due to Defendant's actions, for an unprecedented amount of time, exceeding nine years, without due process. Plaintiff continues to challenge the unconstitutionality and unfairness of her trial in a pending post-conviction motion, based on new information that came to light, including: an undisclosed relationship between jury forewoman Sandra Kirkham and Special Prosecutor Scott Croswell and Croswell's wife, retired Clermont County Juvenile Court Judge and author Stephanie Wyler Croswell; selective prosecution and violation of Hunter's equal protection rights as Justice DeWine and Deters were not charged for violating the law nor suspended after securing public contracts for their family members, significant others and business associates. *Ex. S*

31. Defendants selectively applied the law to protect Justice DeWine and never charged or suspended him as a judge or lawyer. He was allowed to remain on the Ohio Supreme Court, after it became known that he indisputably secured an employment contract for his son at the Hamilton County Prosecutors Office.

32. Although special prosecutor Bradley Frick determined that probable cause existed that Justice DeWine violated the law, the Complaint filed against DeWine was dismissed without prejudice, due to a technicality in the way the case was improperly charged, not due to a dismissal based on the merits of the case,

which were never reached; but Defendants failed to refile complaints against DeWine and Deters when those complaints were selectively dismissed. *Ex. P*

33.    Defendants were aware that Judge Hunter, unlike Justice DeWine, never secured employment for her brother, who obtained his job on his own merit with the Juvenile Court years before Hunter was elected. Croswell initially publicly accused Hunter of hiring her brother, but later changed his allegation when personnel records proved otherwise and alternatively alleged she gave her brother confidential court records of a juvenile to save his job.

34.    Croswell knew that Judge Hunter's brother was an intake officer and gathered and assembled every juvenile's records when he admitted them to the detention center. Defendants knew that Juvenile Court officers, as part of their jobs, had access to the juveniles' court records and computers and that any documents eventually provided to Judge Hunter by Dwayne Bowman, as part of her statutory job to investigate all employee incidents that could impact the court, were likely prepared by her brother and given to Judge Hunter by Bowman.

35.    Defendants knew that Croswell never produced nor identified any alleged confidential records nor established how they could remotely be used to save her brother's job. Hunter's brother did not testify that she provided him confidential documents. Scott Croswell knowingly lied when he made that statement. Janaya Trotter testified that Judge Hunter did not do anything unethical or illegal that she was aware and did not identify any documents. Perhaps this Court can compel the production of the elusive documents that are so secret that Hunter to date has no idea what they are or why she was

convicted. Hunter was one of two statutory employers of the court with hiring and firing power, per the law. She didn't need secret documents to save a job.

36. Defendants also knew that it was part of Judge Hunter's job as employer of the court to know what was going on in her court at all times as she was liable and could be directly sued. They knew that Dwayne Bowman and Shawn Bell were employees of Judge Hunter and, as part of their duties, were obligated to report everything that legally impacted her court to their employer, Judge Hunter, not the other way around. Defendants selectively treated Judge Hunter differently as a judge when they falsely alleged that her subordinates were asked to provide information beyond what was normal, in total contradiction to the law. Defendants knew that all Ohio judges were employers, including Hunter, and were required by law to investigate all incidents. They knew that Judge Hunter made the requested inquiries, as her job required and she was trained, but did nothing extraordinary, illegal, unusual or different in her brother's case.

37. Defendants also knew that multiple employees reported that a white employee was instructed by Bowman, Curt Kissinger and Bell to lie on Stephen Hunter and that employee later admitted she lied at their direction. Contrary to Croswell's false assertions, Defendants knew that Judge Hunter did nothing directly nor indirectly to secure a job for her brother and also knew her brother had informed the Juvenile Court, EEOC and other agencies that he did not want to return to the court, was not trying to get his job back and had other employment.

38. Court Administrator Curt Kissinger, former Judge John Williams, Croswell, Dwayne Bowman and Shawn Bell all knew that Judge Hunter had no motive,

14

intent nor desire to protect her brother's job and had all been informed of that
before Croswell knowingly, falsely charged Judge Hunter with securing a public
contract in violation of the law.  Judge Hunter subpoenaed multiple employees as
witnesses from Juvenile Court that expressed their concerns that Bowman and
court management would retaliate against them for reporting their supervisors.

39.     Defendants knew that Judge Hunter requested the exact same documents and
used the exact same email to make inquiries in every employee incident brought
to her attention. They also knew through public records and trial testimony that,
as a matter of course, she gathered routine information on every claim brought
to her attention, whether it was: an outside court vendor making sexual
harassment claims against a probation officer; a party to a case reporting the
misconduct of a Magistrate or Hunter directly investigating why a child's arm
was broken at the Youth Center. It was well known that Judge Hunter left no
stone unturned when incidents that impacted her court were brought to her
attention.  Defendants knew that numerous employees requested a meeting with
Judge Hunter to report abuses and discrimination by Bowman and management
of the court. Those employees contacted Judge Hunter through court emails, in
person at her chambers, and at open meeting times she publicized that aligned
with her open door policy. Judge Hunter began meeting with detention staff as
soon as she was elected and had an established history of visiting all the
employees that well predated any incident involving her brother. Defendants
intentionally prohibited her extensive court emails from being disclosed to

mislead the finders of fact, collude with those who knowingly fabricated charges and cover up how far they went to keep those false charges from being exposed.

40.    Unlike Justice DeWine's clear-cut case, Defendants not only knew that Hunter did not secure a job for her brother; but allowed Deters and DeWine, who did secure contracts, to control the outcome of her case, a direct conflict of interest and violation of the law and Judge Hunter's right to equal protection. *Ex. P, S*

41.    Defendants knew that Croswell had a duty to disclose the relationship between his wife retired Judge Stephanie Wyler Croswell, jury forewoman Sandy Kirkham and him that were direct conflicts of interests and violations of law as court records will show that three jurors signed affidavits that: Kirkham coerced them to sign the jury verdict form to convict Judge Hunter; their true verdicts were not guilty; and they would have said so if Norbert Nadel had polled jury at Plaintiff's request when the jury verdict was published, as the law requires. Defendants alleged that the federal court denied Hunter's Habeas, but left out that Judge Timothy Black said he didn't review the claim that Hunter was denied a fair trial when three jurors swore that their true verdicts were not guilty, after Hunter's Habeas lawyer David Singleton failed to raise the issue properly on objection. The Sixth Circuit never reviewed the most important Habeas claim. *Ex. T*

42.    Defendants further refused to investigate, file formal complaints or discipline attorneys and judges that committed unethical and unlawful acts, that included: altering Judge Hunter's judicial entries; destroying exculpatory computer evidence: instructing witnesses to lie; failing to answer lawsuits as Judge Hunter's attorneys; and unlawfully interfering in Judge Hunter's cases to procure

outcomes that the prosecutor's wanted in violation of the law. Extensive court emails and entries demonstrate Attorney Murdock and court staff changed, lost or recreated Judge Hunter's entries and made questionable errors. *Ex. R, J, U*

43.     Defendants knew that Murdock changed and backdated innumerable judicial entries, without Judge Hunter's knowledge, after Hunter signed them. Rather than charge Murdock, Defendants dismissed Hunter's complaint, that contained indisputable evidence of Murdock's conduct, then retaliated and filed forgery charges against Hunter to cover up evidence of Murdock's corruption. *Ex. U*

44.     Hamilton County Public Defender Allison Hild testified at Hunter's trial that she knew of other cases that Murdock changed to procure the outcome that prosecutors wanted, after the entries had been filed with the clerk, in the same manner Hunter's entries were changed after she sent them to the clerk. *Ex V*

45.     Defendants knew that Assistant Prosecutor James Harper was the chief trial attorney that represented the Hamilton County BOE against Plaintiff Hunter when they allowed him, in violation of the Code of Professional Responsibility, Rule 1.7[8], to represent Judge Hunter in lawsuits filed against her as judge. *Ex. W*

---

[8] **RULE 1.7: CONFLICT OF INTEREST: CURRENT CLIENTS**
(a) A lawyer's acceptance or continuation of representation of a client creates a conflict of interest if either of the following applies:
(1) the representation of that client will be directly adverse to another current client;
(2) there is a *substantial* risk that the lawyer's ability to consider, recommend, or carry out an appropriate course of action for that client will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by the lawyer's own personal interests.
(b) A lawyer shall not accept or continue the representation of a client if a conflict of interest would be created pursuant to division (a) of this rule, unless all of the following apply:
(1) the lawyer will be able to provide competent and diligent representation to each affected client;
(2) each affected client gives *informed consent, confirmed in writing*;
(3) the representation is not precluded by division (c) of this rule.
(c) Even if each affected client consents, the lawyer shall not accept or continue the representation if either of the following applies:

p 1215-1217. Defendants knew that Harper failed to answer 12 lawsuits as

Hunter's attorney, in violation of Rules 1.1[9], 1.2[10]and 1.3[11], then used the power

of his office to carry out revenge on Hunter when she filed an ethics complaint

against him when those lawsuits resulted in default judgments for his inaction.

Harper testified that she must suffer consequences for filing complaints against

---

(1) the representation is prohibited by law;
(2) the representation would involve the assertion of a claim by one client against another client represented by the lawyer in the same proceeding.
[9] RULE 1.1: COMPETENCE
A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

[10] RULE 1.2: SCOPE OF REPRESENTATION AND ALLOCATION OF AUTHORITY BETWEEN CLIENT AND LAWYER
(a) Subject to divisions (c), (d), and (e) of this rule, a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer does not violate this rule by acceding to requests of opposing counsel that do not prejudice the rights of the client, being punctual in fulfilling all professional commitments, avoiding offensive tactics, and treating with courtesy and consideration all persons involved in the legal process. A lawyer shall abide by a client's decision whether to settle a matter.

[11] RULE 1.3: DILIGENCE
A lawyer shall act with reasonable diligence and promptness in representing a client.
Comment
[1] A lawyer should pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer. A lawyer also must act with commitment and dedication to the interests of the client.
[2] A lawyer must control the lawyer's work load so that each matter can be handled competently.
[3] Delay and neglect are inconsistent with a lawyer's duty of diligence, undermine public confidence, and may prejudice a client's cause. Reasonable diligence and promptness are expected of a lawyer in handling all client matters and will be evaluated in light of all relevant circumstances. The lawyer disciplinary process is particularly concerned with lawyers who consistently fail to carry out obligations to clients or consciously disregard a duty owed to a client.
[4] A lawyer should carry through to conclusion all matters undertaken for a client, unless the client-lawyer relationship is terminated as provided in Rule 1.16. Doubt about whether a client-lawyer relationship still exists should be clarified by the lawyer, preferably in writing, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the lawyer has ceased to do so. For example, if a lawyer has handled a judicial or administrative proceeding that produced a result adverse to the client and the lawyer and the client have not agreed that the lawyer will handle the matter on appeal, the lawyer must consult with the client about post-trial alternatives including the possibility of appeal before relinquishing responsibility for the matter. See Rule 1.4(a)(2). Whether the lawyer is obligated to pursue those alternatives or prosecute the appeal for the client depends on the scope of the representation the lawyer has agreed to provide to the client. See Rules 1.2(c) and 1.5(b).

the prosecutor's office, as it was the worst thing one could do to a lawyer. Defendants knew that Harper and Deters accused Judge Hunter of crime as revenge for her filing complaints against the prosecutors. *Ex. W p. 1240-1242*

46.   When Judge Hunter was frivolously sued over 12 times as judge, Defendants, in violation of the law, allowed Deters and Harper, the lead trial prosecutor opposing her election, to represent her, knowing it was a clear conflict of interest and the lawsuit was still ongoing in court a year after Judge Hunter won. *Ex. W*

47.   At the time Defendants allowed Deters and Harper to represent Judge Hunter, their public hostility was extensively documented in the media and court records. Harper was representing Hunter when then First District Court of Appeals Judge Patrick Dinkelacker held her in contempt for prohibiting the media from publishing the names and faces of 12-year old black children to protect them from harm, although she had followed the Local Rules of Court and Rules of Superintendence to the letter of the law and retained child psychiatrists who evaluated each child and advised her that it would prevent their successful rehabilitation if their names and faces were exposed. Deters showed no concern for protecting the children and did not provide her competent representation.

48.   When Deters' employees Christian Schaefer and Harper neglected to file answers or appeal the 12 default judgments against Judge Hunter that resulted when they failed to answer 12 lawsuits, Defendants did not discipline those attorneys for their inexcusable neglect, ineffective assistance of counsel and violation of law and ethics as her legal counsel, but colluded in retaliation to remove Hunter. In most instances, lawyers would face disbarment for such gross misconduct.

49. In retaliation, soon after Judge Hunter filed grievances against Deters and Harper for: suing and representing her at the same time; and neglecting to answer lawsuits as her lawyers, Defendants allowed Croswell to charge her with crimes for properly appealing those lawsuits, rather than discipline Deters, Schaffer and Harper for breach of their fiduciary duties as her lawyers.

50. When white judges in Hamilton County were sued, law firms that typically represented judges were retained to defend them, like Maguire & Schneider; but after Deters terminated his representation, following Hunter's complaint, Defendants allowed Deters to handpick lawyers with no juvenile law experience to represent Hunter. Those lawyers, James Bogan and Firooz Namei were paid over $80,000 but also failed to answer the 12 Writs or appeal the default judgments, in violation of the Code. Defendants failed to discipline Bogan and Namei after they provided Judge Hunter, ineffective assistance of counsel and Hunter was forced to defend those cases pro se and hire attorney Branch to defend and answer the lawsuits they wantonly failed to answer. *Ex. E, F, G, H, I, Q*

51. Judge Hunter was forced to file 12 Notices of Appeal in her judicial capacity and retained Attorney Jennifer Branch to defend the 12 lawsuits that Deters, Harper, Schaefer, Bogan and Namei intentionally failed to answer or defend, as her legal counsel. *Ex. E, F, G, H, I*

52. Each notice of appeal cost $100. When Hunter paid $1,200.00 to the Ohio Supreme Court to appeal 12 cases that Deters, his employees and lawyers he picked failed to defend, Croswell knowingly charged her with five felony counts of theft and misuse of a credit card for using court funds to defend the suits in a

20

manner consistent with the terms of the contract she signed. Defendants knew that Croswell was aware when he falsely charged Judge Hunter that Deters, who retained Croswell, neglected to represent her and that she acted in accordance with the law to protect the Juvenile Court. When Hunter filed complaints against Croswell for falsely charging her with crimes and against Bogan and Namei for their irrefutable failure to competently represent her, Defendants dismissed her complaints and soon after charged Hunter for blowing the whistle.

53. Defendants strategically dismissed Hunter's complaints to prevent the unlawful actions taken against her from being publicly exposed. Defendants knew that those individuals terrorized Plaintiff ad nauseam with unprecedented, vicious, malicious and unlawful conduct, but colluded with them to harm her.

54. Defendants knew that retired Justice O' Connor made an unprecedented personal visit to Judge Hunter and threatened her to stop asserting her claims. When Hunter wouldn't promise to meet her demands, during their face to face meeting that she forced Hunter to attend, O'Connor used the power of her position to retaliate, pressure, interfere with the execution of her duties and eventually remove Hunter. O'Connor compelled several judges, including an Ohio Supreme Court Justice, to contact Hunter to tell her to stop pursuing being the administrative judge of the court and to warn Hunter's supporters to stop defending her in the media. The OSC then changed the Rules of Superintendence

3 and 4, without seeking the required public comments, to prevent Hunter from being administrative judge,[12] which she was lawfully entitled to do.

55. Defendants knew that HCJC had been backlogged with cases for nearly a decade under white Republican judges before Hunter was elected, but publicly blamed Hunter, a black judge, although OSC public records revealed that John Williams, a white judge, had more cases out of time. Defendants also knew that Hunter, per OSC records, had the highest caseload of any juvenile judge in Ohio. *Ex. E, F G, H, I, X, Y* But O'Connor falsely blamed Hunter for the pre-existing backlog, then selectively reassigned Hunter's cases to a retired white Republican Judge.

56. O'Connor took unprecedented actions against Hunter, demonstrating she was biased, and treated Judge Hunter differently than any of her white predecessors. Defendants knew O'Connor received considerable campaign donations from Deters and private law firms in Cincinnati with a vested interested in the Juvenile Court and used the power of her position as Chief Justice to deny Plaintiff equal protection and due process under the law.

57. Judge Hunter was charged with four felony counts of tampering with evidence, after Deters falsely alleged she backdated documents. Although Defendants knew that attorney Connie Murdock and Lisa Miller, at Murdock's direction,

---

12 (A) Single-judge courts
In a single-judge court of common pleas or a single-judge municipal or county court, the judge shall serve as the presiding judge of the court.
(B) Multi-judge courts(1) In a court of appeals, a multi-judge court of common pleas, or a multi-judge municipal or county court, the judges of the court shall elect by a majority vote a presiding judge of the court from the judges of the court.(2) If the judges of a court are unable to elect a presiding judge of the court pursuant to division (B)(1) of this rule, the presiding judge shall be determined as follows: (a) The judge having the longest total service on the court shall serve as the presiding judge;
Rule 3 - Designation or Election of Presiding Judge, Ohio R. Superi. Ct. 3

changed Hunter's entries, and court records proved the same, Defendants failed to discipline Murdock. When Plaintiff Hunter filed a grievance against Attorney Murdock for unlawfully changing her judicial entries without her knowledge and provided indisputable documentation that Murdock changed Hunter's entries, then allowed Hunter to be charged with crimes for her actions, Defendants dismissed Hunter's complaints and charged Hunter to keep Murdock's criminal intent to frame Hunter from being exposed. *Ex. D, R, U, Z*

58. Although Plaintiff Hunter provided ample evidence of public records, including her judicial entries demonstrating that Murdock altered Hunter's entries, then recreated and backdated Hunter's entries after alleging the court lost them, Defendants dismissed Hunter's complaints to cover up the collusive and conspiratorial plan to frame Judge Hunter. *Ex U, Z*

59. Defendants continue to assert in public records, including a complaint they filed against Hunter, that she was charged with backdating documents, despite knowing she did not. Defendants continue to allege that Plaintiff committed criminal acts they know she did not do or that were not crimes, like filing appeals to defend her court when Deters failed to do so. Defendants in violation of the law continue to allege false statements with intent to harm Hunter.

60. When State's Witness Don Flischel testified at Hunter's trial that prosecutors told him to withhold evidence from an affidavit presented to the grand jury that he knew attorney Murdock and Miller backdated her judicial entries, Defendants failed to discipline Deters, Croswell or Murdock. Defendants then dismissed

Hunter's complaints to prevent their actions from being exposed, and filed a Complaint against Plaintiff Hunter for filing grievances. *Ex. D*

61. On January 10, 2014, the day Judge Hunter was indicted, former Justice O'Connor gave a speech on judicial election reform at the Clermont County Chamber of Commerce, as part of a campaign to reform Ohio's judiciary. Chris Davey at the Ohio Supreme Court provided Justice O'Connor's prepared remarks. In violation of the Code of Judicial Conduct, she made disparaging comments hours after she suspended Hunter as a judge and from the practice of law. O'Connor demonstrated a predisposed bias against Hunter in violation of 2.11(A)13 of the Ohio Code of Judicial Conduct when she impugned Judge Hunter's character and publicly denied her the presumption of innocence before trial. In a 4-3 split, with "O'Connor ruling not to hear Hunter's most high profile case on appeal, O'Connor towed the Republican line for her party as she had in 2011 when she ruled not to count the votes that sealed Hunter's election and later sealed Hunter's backdoor removal by allowing all Hunter's opponents to preside over her trial, thereby

---

[13] Rule 2.11(A) of the Ohio Code of Judicial Conduct states that "[a] judge shall disqualify himself or herself in any proceeding in which the judge's *impartiality* might reasonable be questioned, including but not limited to the following circumstances:

(1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding.

...

(5) The judge, while a judge or a judicial candidate, has made a public statement, other than in a court proceeding, judicial decision, or opinion, that commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy.

...

(7) The judge meets any of the following criteria:

...

(b) The judge served in governmental employment, and in such capacity participated personally and substantially as a lawyer or public official concerning the particular matter, or has publicly expressed in such capacity an opinion concerning the merits of the particular matter in controversy . . . .

demonstrating a clear pattern of her abuse of power and public office in order to continue to support and promote a blatant, historical pattern and practice of unlawful, racial discrimination.

62. Defendants were aware of all the familial relationships that existed between prosecutors that prosecuted cases in Hunter's Juvenile Court and their fathers that worked on the Common Pleas and on the First District Court of Appeals. Defendants enabled the flagrant abuse of power with no regard for case law, rules of conduct, constitutional violations or the appearance of impropriety. Defendants knew that trial court judge Dinkelacker's daughter Leah worked for Deters and prosecuted cases before Judge Hunter. They also knew that Dinkelacker impugned Hunter's competency and character in cases as an appellate judge and held her in contempt. When Dinkelacker was sued in a wrongful death action after crossing the center line and killing a woman, Defendants allowed a visiting judge to hear his case, but denied Judge Hunter the same right to have her case heard before an independent, visiting judge.

63. Deters was even afforded a visiting judge to hear his divorce case, but Hunter, who had been viciously opposed almost two years by Deters' office and called unpatriotic in the media by the chair of the Hamilton County Republican Party for contesting her election was denied a fair, impartial judge from outside of Hamilton County. Defendants colluded to falsely charge Hunter by allowing friends and family members of her accusers to sit on her jury and preside over her case, which denied her Sixth Amendment right to an impartial jury.

64.     Defendants knew that almost daily for countless years Attorney Bill Cunningham

        disparaged Hunter on 700 WLW, the largest radio station in the State of Ohio,

        and called her racist names to sway public opinion against her; but allowed Bill's

        wife, former first District Court of Appeals Judge Penelope Cunningham to

        preside over Hunter's appeal and rule in lock step with her husband. Defendants

        didn't care about impropriety as white judge's family members publicly tag

        teamed to trample Hunter's constitutional rights while they brazenly secured

        jobs for their family members, while accusing Hunter of nepotism.

65.      The interconnectedness and incestuous relationships between white judges and

        their family members alone warranted that Hunter have an independent judge

        not tied to Hamilton County, but Defendants ignored all of the precedent

        Supreme Court decisions that provided the same.[14] Those cases in reaching

        decisions to disqualify judges quoted the Preamble of the Code of Judicial

        Conduct. "With respect to judicial disqualification, the Supreme Court of Ohio

        has stated that "'[p]reservation of public confidence in the integrity of the

        judicial system is vitally important,' and '[a]n appearance of bias can be just as

        damaging to public confidence as actual bias.'" In re Disqualification of Burge,

        138 Ohio St.3d 1271, 2014-Ohio-1458, ¶ 9, quoting In re Disqualification of

        Murphy, 110 Ohio St.3d 1206, 2005-Ohio-7148, ¶ 6. Thus, the Code of Judicial

        Conduct provides that "[a] judge shall disqualify himself or herself in any

---

[14] *In re Disqualification of Nugent*, 47 Ohio St.3d 601, 546 N.E.2d 927 (1987); *In re Disqualification of Sheward*, 100 Ohio St.3d 1221, 2002; *In re Disqualification of Nadel* (1989), 47 Ohio St.3d 604, 546 N.E.2d 926; *In re Disqualification of Rastatter*, 127 Ohio St.3d 1215, 2009; *In re Disqualification of Corrigan*, 110 Ohio St.3d 1217, 2005-Ohio-7153, 850 N.E.2d 720; *In re Disqualification of Burge*, 138 Ohio St.3d 1271, 2014

proceeding in which the judge's impartiality might reasonably be questioned[.]" Jud.Cond.R. 2.11(A). But Defendants allowed multiple judges whose children worked for Deters, prosecuted cases in Hunter's courtroom and had a personal interest in the outcome preside over Hunter's trial in violation of the law.

66. Defendants knew Deters made outrageous public comments about Hunter in the news, including stating she was mentally ill, a tactic used by Defendants against other black female judges in Ohio, in a blatant pattern of racial discrimination and differential treatment, and dismissed her complaint when she reported it. But Defendants disciplined a lawyer for questioning the mental health of a white lawyer. *Ex. AA* Defendants supported the disparagement of a black judge, but not a white lawyer, in violation of the Code of Professional Responsibility[15] and denied Hunter's right to equal protection under the law.

67. When Deters issued a press release two days before Hunter's trial alleging that Judge Hunter was responsible for the murders of two people, widespread media published his statements.[16] Defendants did not discipline Deters, deciding it was acceptable for a white prosecutor to falsely accuse a black judge of murder.

68. Multiple jurors admitted during voir dire that they were predisposed to find Hunter guilty, based on the negative media coverage, like murder, which once again demonstrates how Hunter was denied her Sixth Amendment right to an

---

[15] RULE 8.2: JUDICIAL OFFICIALS
(a) A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judicial officer, or candidate for election or appointment to judicial office.

[16] https://www.youtube.com/watch?v=23N_EHJV408

impartial jury. Defendants routinely disciplined lawyers that made disparaging comments against white judges and lawyers, but selectively treated Judge Hunter differently, in violation of the law. Defendants' selective disciplinary process amounted to collusion.

69. Defendants waited over nine years to file disciplinary charges against Hunter, not after she exhausted her appeals, but after she presented evidence to the trial court that special prosecutor Croswell's wife, former Ohio Clermont Juvenile Court Judge Stephanie Wyler, and jury forewoman Sandra Kirkham, whose husband Bill is a partner for one of the largest law firms in Cincinnati, Frost, Brown & Todd, that represented WCPO TV station when they sued Judge Hunter, wrote the editorial review for one another's published books. When Plaintiff filed a Complaint against Croswell seeking redress for his misconduct, Defendants rushed to file a disciplinary action against Hunter to keep Croswell's conduct and the widespread collusion and corruption of Defendants that enabled his misconduct and abuse of Judge Hunter from being publicly exposed.

70. Even Croswell's son attorney Nicholas Croswell was hired by Deters in the prosecutor's office on September 14, 2014. Hunter's trial started September 8, 2014. It seemed the Enquirer's allegation of Deters' pay to play was not lost on Croswell or his family, as he was handsomely paid for filing false charges against Judge Hunter and his son snagged a coveted position in Deters' office as a bonus.

71. Hunter's lawyers also received messages and benefits that clearly impacted her trial. Her initial trial attorney Clyde Bennett told Hunter that Deters' office threatened that he would not receive any more plea deals for his other clients

after a vigorous pretrial argument in Hunter's case, demonstrating how extensively the Defendants abused their power to strip Hunter of her Constitutional rights and penalize her for exposing the corruption in the judicial and juvenile court systems. Hunter's Habeas Objection was botched when her attorney, per the ruling, failed to properly object to the Magistrate's ruling and reduced the most important argument of all (that three jurors said their true verdicts were not guilty) to a footnote, rather than in the body of the document. Deters later donated $25,000 to her appellate lawyer's agency while he represented Hunter. When Hunter switched lawyers, after her Habeas case was compromised, her new lawyers, unbeknownst to her, duplicated a brief almost word for word that her first Habeas counsel "prepared" and transferred to them, despite accepting a $25,000 retainer fee from her to write a brand new Brief. A computer specialist reviewed the metadata on the document and discovered that the author of Hunter's "new" Habeas appellate brief was a Deters. *Ex. CC* Joe Deters initiated allegations that led to Hunter being charged with crimes. Hunter never retained anyone with the name Deters to represent her, or write briefs on her behalf. It begs to question why Hunter lost all of her appeals and Habeas.

72.   Jury forewoman Sandy Kirkham wrote an editorial review that is included on the back cover of the book, Certain Truths, authored by special prosecutor Scott Croswell's wife, former Juvenile Judge Stephanie Wyler. *Ex. DD* Wyler in turn wrote an editorial review that is on the back cover of Kirkham's book, Let Me Prey Upon You, a book about her disdain for pastors, after a sexual relationship with her youth pastor that she neglected to reveal. Hunter is also a pastor.

73. During Hunter's first year as judge, she uncovered internal court corruption, like case statistics being falsely reported, judge shopping and other irregularities in the disparate treatment of cases and juveniles, based on race and familial connections. When Hunter reported her concerns to the Supreme Court, rather than hold those responsible accountable and help her clean up the corruption she exposed and other watchdog organizations uncovered, they falsely accused Hunter of crimes and Defendants immediately suspended her. *Ex. EE, FF*

74. Given Defendants' knowledge of all the aforementioned conduct and their failure to discipline the attorneys under their jurisdiction that carried out the aforementioned acts against Hunter, it is clear Defendants colluded to deny Hunter's right to redress and selectively applied rules and laws in an arbitrary and capricious manner.

75. Defendants waited nine years then suddenly filed a disciplinary action against Hunter after she sought redress in a post conviction motion. Two things precipitated their action: new evidence came to light of a relationship involving the special prosecutor in her case, his wife and jury forewoman; and Hunter filed grievances naming all those involved who falsely accused her of crimes and supplied supporting evidence of every allegation she raised. Defendants rushed to silence Hunter again before all the evidence of such unimaginable corruption could be exposed. Only after Gov. Mike DeWine appointed Deters to the OSC and it impacted the entire state of Ohio did others finally begin to expose what Defendants knew all along regarding violations of law and ethics in Hamilton County; but Defendants covered it up when they harmed Plaintiff Hunter. *Ex. GG*

**CONCLUSION**

76.   After all Defendants have done to harm Plaintiff since she ran for office and
      prevailed, those being held accountable for the diabolical acts they committed
      are more important than the law license they maliciously and vindictively took
      to keep Hunter from occupying the seat she fairly and squarely won. Defendants'
      conduct has resulted in a clear pattern of abuse, selective disciplinary actions
      and discrimination based on race and color. Hunter has been suspended as judge
      of the Hamilton County Juvenile Court, Common Pleas Division and barred from
      the practice of law in the State of Ohio since January 10, 2014, for an
      unprecedented nine years before being charged by Defendants. Plaintiff was
      suspended the majority of her judicial term, after starting 18 months late, and
      denied her livelihood and reputation that they irreparably destroyed with false
      charges. To further injure her, Defendants filed a disciplinary charge against
      Hunter after she filed complaints against the white lawyers that falsely accused
      her of crimes, but actually committed the crimes they alleged she committed.

77.   While Defendants were laser focused on destroying Judge Hunter to remove her
      from office, Defendants selectively failed to file disciplinary charges against Ohio
      Justice DeWine who secured a job for his son in Deters' office, then colluded with
      Deters, his friend of over 30 years, to send Hunter to jail for six months. It would
      also violate the Judicial Code of Conduct and raise questions of employment law
      and ethics for a justice to have a relationship with his staff employee. Deters and
      DeWine's direct actions of falsely accusing Judge Hunter of crime, after framing
      her for those crimes, followed by upholding her conviction on appeal, took a lot

31

of chutzpah, given their open behavior. Their acts went far beyond the pot calling the kettle black, no pun intended. Unlike Hunter, who was falsely accused, Deters and DeWine actually blatantly and knowingly violated the ethical and legal standards for which Hunter was viciously and systematically prosecuted. However, unlike Hunter, they were never prosecuted or disciplined despite the ample evidence, including public records, to warrant both disciplinary and legal proceedings when their conduct fit within the four corners of the statute that clearly precluded their behavior. Yet Defendants selectively charged Hunter, removed her, allowed DeWine to stay on the Supreme Court and Deters was appointed to the Supreme Court by DeWine's father, Gov. Mike DeWine.

78. As an African-American woman, Plaintiff Hunter is part of a protected class under the Constitution of the United States. The actions giving rise to this lawsuit are based on race discrimination, selective prosecution, and the right to be treated equally under the law. Defendants have engaged in an ongoing pattern of discrimination and treated her differently than all the white judges in the state of Ohio and callously disregarded Plaintiff's constitutional rights. While Hamilton County, as of 2020, saw the election of more judges of color, than when Judge Hunter was elected in 2010, Hunter was in a class by herself as the first to break the glass ceiling and would remain in that class for nearly a decade before the next black person would be elected to a Common Pleas or Countywide seat of any office. As the first, she faced brutal opposition, abuse and injury that continued when Defendants failed to discipline those responsible and double downed in their efforts to justify such deplorable maltreatment and abuse of law.

79.  The incestuous, nepotistic history of Hamilton County is widespread and known across the state of Ohio. The entire court system, including Juvenile Court, is overrun with family members of judges and elected officials, especially their children. No less than three white judge's children were prosecuting cases at Juvenile Court when Hunter was suddenly accused of crime, suspended, and removed. ***Ex. BB*** The gall and hypocrisy to accuse a black judge of nepotism whose only family member secured his job before Hunter was elected and was terminated by Hunter's opponent John Williams, a white judge, who was appointed to the two-judge court after Hunter beat him in the election would be laughable, given the absurdity of Hamilton County's employment roster that reads like Ancestry.com, but the destruction they caused is no laughing matter.

80.  During Hunter's disciplinary hearing, Defendants barred all exhibits that demonstrated that at all times, she acted in accordance with the rules governing the professional and ethical conduct of judges and followed: The New Judges Training Manual she received during her in person training in employment law for judges from the Ohio Supreme Court that guided her actions as the statutory and Constitutional employer of the Hamilton County Juvenile Court. *Ex. L.*

81.  Defendants conspired and colluded to preclude evidence that she acted in accordance with her training that emphasized she had a duty to investigate all allegations of alleged misconduct for which the court could be held liable and cause her to be sued as the employer. Defendants also excluded evidence that Hunter used the same email in every instance at Juvenile Court to perform her due diligence and gather information when incidents involving any employee

33

were reported to her by the court administrator or other staff. They knew

Hunter's requests were consistent, identical and part of her job. It was clear that

Defendants did not investigate Hunter in an objective manner to determine the

truth, but attempted to hide emails and court records that helped them to cover

up the criminal actions of white lawyers that framed Hunter at Juvenile Court.

82.     Defendants held Hunter to an entirely different standard than white judges and

lawyers under their direct control; failed to discipline white judges and lawyers

that clearly broke the law; and suspended Hunter for doing her job as her

training directed, thereby clearly showing a pattern and practice of

discrimination in violation of her Constitutional rights.

83.     Defendants allowed Justice Pat DeWine to secure a public contract for his son, a

member of his household. DeWine not only was never formally charged or

suspended as a judge or lawyer, but was allowed to determine Hunter's fate as a

lawyer and judge. Deters secured a million dollar contract for his personal

defense lawyer Croswell and hired Croswell's son in his office in what appeared

to be quid pro quo enumeration at the same time Hunter was prosecuted.

84.     Justice Pat DeWine's conduct in securing a job for his son in the Prosecutor's

Office and other conduct alleged in the media violated: Jud.Cond.R.1.1 [A judge

shall comply with the law]; Jud.Cond.R.1.2 [A judge shall act at all times in a

manner that promotes public confidence in the independence, integrity, and

impartiality of the judiciary, and shall avoid impropriety and the appearance of

impropriety]; Jud.Cond.R.1.3 {A judge shall not abuse the prestige of judicial

office to advance the personal or economic interests of the judge or others, or

34

allow others to do so]; and Jud.Cond.R.2.4(b) [A judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment] and Defendants' collusion with their actions diminishes the credibility and integrity of OSC's disciplinary process when rules, laws and ethics are arbitrarily and disparately applied. Plaintiff filed this action because Defendants intentionally and negligently caused her irreparable harm by failing to charge DeWine for violating the Judicial Code of Conduct and Revised Code, but selectively charged Hunter in violation of her right to equal protection as a black woman and such harm is likely to continue.

### FIRST CAUSE OF ACTION-VIOLATION OF FOURTEENTH AMENDMENT

85. Plaintiff incorporates by reference and alleges each and every allegation within this complaint as if set forth herein.

86. The Fourteenth and Fifth Amendments to the United States prohibits the deprivation of a persons, life, liberty, or property without due process of law; and prohibits the denial of equal protection of the laws.

87. Plaintiff Hunter is a citizen of the United States of America and has clearly established rights and protections under the Constitution that guarantee Due Process and Equal Protection of the law, among other guarantees. Defendants failed to prosecute white lawyers and judges whose conduct violated the law, but selectively prosecuted plaintiff.

88. The Ohio Supreme Court Rules for the Government of the Bar, Rule V, Section 4 (Office of Disciplinary Counsel) provides in Section 4(A)(1) and (2): (A) Disciplinary Counsel. With the approval of the Supreme Court, the Board, by

majority vote, shall appoint a disciplinary counsel who shall perform all of the following duties: (1) Investigate allegations of misconduct by judicial officers or attorneys and allegations of mental illness, alcohol and other drug abuse, or disorder affecting judicial officers or attorneys; (2) Initiate and prosecute complaints as a result of investigations under the provisions of this rule.

89. Therefore, the Disciplinary Counsel and the defendants are prosecutors who prosecute investigations and complaints against Ohio attorneys and former attorneys on behalf of the Supreme Court of the State of Ohio. The United States Constitution governs their actions.

90. Defendants singled out Plaintiff for selective prosecution by Defendants. Their conduct, contained herein, violated and continue to violate the clearly established rights to be free of selective prosecution and her right to equal protection under the law as provided by the First and Fourteenth Amendment of the U.S. Constitution, thereby giving rise to liability for damages and other relief against the Defendants pursuant to 42 U.S.C. § 1983.

**SECOND CAUSE OF ACTION-VIOLATION OF TITLE VII**

91. Plaintiff incorporates by reference and alleges each and every allegation within this complaint as if set forth herein.

92. Plaintiff is an African-American woman and member of a protected class. As a result of Defendants' policies and practices, Plaintiff has been unjustly and discriminatorily deprived of income in the form of wages, benefits and retirement, and the ability to be dutifully employed in her profession.

93. As a direct and proximate result of Defendants' violations of Plaintiff's Constitutional Rights under Title VII of the Civil Rights Act of 1964, Plaintiff has suffered irreparable harm, including the loss of her employment, entitling her to declaratory, equitable and injunctive relief and legal and exemplary damages.

### THIRD CAUSE OF ACTION-DEFAMATION

94. Plaintiff incorporates by reference and alleges each and every allegation within this complaint as if set forth herein.

95. Defendants published or caused false statements regarding the Plaintiff to be published. Those false statements were published, republished, circulated and/or otherwise disseminated in the: newspaper; television; magazines; legal publications; social media, blogs and online publications all over the world. The damages of Defendants' statements are irreparable.

96. At all relevant times, Defendants knew that their statements and allegations were false, and were made with reckless disregard to their lack of veracity.

97. Defendants acted wantonly and with malicious intent to harm when they published or caused statements to be published, orally and written, in reckless disregard of the truth.

98. Defendants knew when they made such statements that they were false, but were made maliciously and in reckless disregard of the truth knowing such statements would and did cause extensive, irreparable harm to Plaintiff.

99. Defendants' oral and written statements were a direct and proximate cause of the injuries, damages and harm suffered by Plaintiff.

100. Because the above-named Defendants' conduct toward Plaintiff was improperly motivated, intentional, willful and wanton, Plaintiff is entitled to punitive exemplary damages in addition to compensatory damages.

## FOURTH CAUSE OF ACTION-NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

101. Plaintiff incorporates by reference and alleges each and every allegation within this complaint as if set forth herein.

102. Defendants continually and negligently inflicted severe emotional distress on Plaintiff when they wantonly failed to prosecute complaints against attorneys and judges and colluded with those attorneys and judges to deprive her of her Constitutional rights to seek redress and be made whole for the irreparable damages they caused Hunter when they selectively prosecuted her, but failed to prosecute white judges and lawyers under the same statute they prosecuted Hunter and allowed those individuals to be involved in her prosecution.

103. Defendants' actions were a direct and proximate cause of the injuries, damages and harm suffered by Plaintiff.

104. Because the above-named Defendants' conduct toward Plaintiff was improperly motivated, intentional, willful and wanton, Plaintiff is entitled to punitive exemplary damages.

## FIFTH CAUSE OF ACTION-INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

105. Plaintiff incorporates by reference and alleges each and every allegation within this complaint as if set forth herein.

106. As set forth herein, Plaintiff was subjected to a selective pattern of discrimination and misconduct based, in whole or in part, on her race.

107. At all relevant times, the above-named Defendants knew or should have known that their allegations against Plaintiff were extreme, exceeded the bounds of decency and were committed in a willful and wanton manner that constituted a disregard of Plaintiff's rights.

108. As a direct and proximate result of the Defendant's conduct, Plaintiff suffered severe emotional distress entitling Plaintiff to punitive/exemplary damages.

**SIXTH CAUSE OF ACTION-MALICIOUS PROSECUTION-42 U.S.C. § 1983**

109. Plaintiff incorporates by reference and alleges each and every allegation within this complaint as if set forth herein.

110. Defendants selectively prosecuted Plaintiff under false and malicious pretenses, but failed to prosecute Justice Deters, DeWine and other similarly situated white judges for actions that they alleged against Hunter, that they knew to be untrue.

111. As a direct and proximate result of the Defendant's conduct, Plaintiff suffered irreparable damages and seeks remedies stated in the prayer for relief and as allowed by law.

**SEVENTH CAUSE OF ACTION-MALICIOUS ABUSE OF PROCESS**

112. Plaintiff incorporates by reference and alleges each and every allegation within this complaint as if set forth herein.

113. Defendants maliciously, selectively and discriminately used its disciplinary process `to accomplish an ulterior purpose for which it was not designed or intended.

114.  Defendants are liable pursuant to the theories of ratification, respondent superior, agency and/or implied agency.

115.  Defendants' abuse of the disciplinary process was the direct and proximate cause of the injuries, damages and harm suffered by Plaintiff.

116.  Because the above-named Defendants' conduct towards Plaintiff was improperly motivated, intentional, willful and wanton, Plaintiff is entitled to all damages contained in her prayer of relief and allowed by law.

**EIGHTH CAUSE OF ACTION- VIOLATION OF SIXTH AMENDMENT**

117.  Plaintiff incorporates by reference and alleges each and every allegation within this complaint as if set forth herein.

118.  The Sixth Amendment to the United States guarantees, among other things, the rights of criminal defendants to an impartial jury, and the right to know the nature of the charges and evidence against them.

119.  Defendants, by allowing Judge Hunter's accusers and accuser's family members, close friends, colleagues and employee of the TV station that was suing Hunter when she was indicted, to participate in the grand jury and petit jury processes, denied her right to an impartial jury. An employee of WCPO TV was on her jury.

120.  Defendants by allowing Judge Hunter's accusers to withhold the identification and production of the alleged evidence against her, denied her right to know the specific nature of the charges against her in violation of the law.

121.  As a direct and proximate result of the Defendant's conduct, Plaintiff suffered irreparable damages and seeks remedies stated in the prayer for relief and as allowed by law.

**NINTH CAUSE OF ACTION- TITLE 41 SECTION 4113.52**

122.    Defendants immediately retaliated against Judge Hunter after she reported the
conduct of court employees that violated the law, in violation of Title 41.

123.    As a direct and proximate result of the Defendant's conduct, Plaintiff suffered
irreparable damages and seeks remedies stated in the prayer for relief and as
allowed by law.

**TENTH CAUSE OF ACTION- 42 U.S.C. §1983 - - United States Constitution**

124.    Defendants, acting under color of law, have violated rights secured to the
Plaintiff by the Fourteenth Amendment to the United States Constitution
including the right to due process of law and the right to equal protection under
the law.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, Plaintiff respectfully prays for judgment against Defendants as
follows:

A.    That this Court enter a temporary restraining order and/or a preliminary
injunction to enjoin the defendants from further prosecution of the pending
investigation it sua sponte initiated while Plaintiff's post-conviction motion is
proceeding, which is the sole basis of Defendants' Complaint against Plaintiff;

B.    Compensatory damages in an amount to be shown at trial;

C.    Punitive Damages in an amount to be shown at trial;

D.    Costs incurred in this action and reasonable attorney fees under 42 U.S.C. §
1988;

E.    Prejudgment interest; and

F.  Such other and further relief as this Court may deem just and reasonable.

Respectfully submitted,

Tracie M. Hunter
Pro Se
PO Box 32325
Cincinnati, Ohio
45232
(513) 662-6247

## VERIFICATION

I Tracie Hunter, pursuant to 28 USC §1746, declare under the penalty of perjury under the United States of America that the following are true and correct:

1.      The allegations contained in this Complaint are true and accurate to the best of my knowledge.

2.      The attached exhibits are true and accurate to the best of my knowledge.

Tracie Hunter, March 21, 2023

## JURY DEMAND

Plaintiff hereby demands a jury trial.

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served on all parties via filing with the united state's district court's clerk's office on March 21, 2023.

Tracie M. Hunter